# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

16-4006

**UNITED STATES OF AMERICA,**

Appellee,

v.

**RANDY JOE METCALF, A/K/A RANDY JOE WEYKER,**

Appellant.

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF IOWA
HONORABLE LINDA R. READE, CHIEF U.S. DISTRICT COURT JUDGE*

## APPELLANT'S BRIEF

**Heather Quick**
*FEDERAL PUBLIC DEFENDER'S OFFICE*
222 Third Avenue SE, Suite 290
Cedar Rapids, IA 52401
PHONE: (319) 363-9540
FAX: (319) 363-9542

ATTORNEY FOR APPELLANT

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Defendant Randy Metcalf (hereinafter "Metcalf")[1] was charged with a federal hate crime, in violation of 18 U.S.C. § 249(a)(1). The case proceeded to a jury trial. It was undisputed that Metcalf willfully caused bodily injury to the victim. The trial was focused on whether Metcalf assaulted the victim, an African American man, because of his race. The jury convicted Metcalf as charged.

On appeal, Metcalf raises three challenges to his conviction. First, he argues the district court erred in denying his motion to dismiss the indictment. Congress relied on the Thirteenth Amendment to enact § 249(a)(1). However, § 249(a)(1) is an invalid exercise of Congress's power under the Thirteenth Amendment. Second, Metcalf asserts there is insufficient evidence to support his conviction. Specifically, the evidence did not establish that the victim's race was the determinative factor in the assault. Finally, he argues the district court committed reversible error in refusing to provide a jury instruction on character evidence.

Because his appeal raises a complex constitutional issue of first impression, Metcalf requests 15 minutes for oral argument.

---

[1] Metcalf changed his name at the end of his criminal case. However, because the majority of the pleadings and the trial transcripts use his former name of Metcalf, for sake of clarity, this brief will use his former name.

Appellate Case: 16-4006     Page: 2     Date Filed: 12/21/2016 Entry ID: 4482350

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT .......... ii

TABLE OF AUTHORITIES ................................................................iv

JURISDICTIONAL STATEMENT ................................................. vii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF THE CASE..............................................................2

SUMMARY OF THE ARGUMENT ...................................................12

ARGUMENT ...................................................................................13

    I.    SECTION 249(a)(1) OF THE HATE CRIMES ACT IS UNCONSTITUTIONAL BECAUSE IT IS AN INVALID EXERCISE OF CONGRESS'S LAWMAKING AUTHORITY ................13

    II.    INSUFFICIENT EVIDENCE EXISTS TO SUPPORT METCALF'S CONVICTION BECAUSE THE VICTIM'S RACE DID NOT PLAY THE DETERMINATIVE ROLE IN THE ASSAULT ................................25

    III.    THE DISTRICT COURT'S REFUSAL TO GIVE A CHARACTER EVIDENCE INSTRUCTION IS REVERSIBLE ERROR, AS THIS WAS THE MAIN THEORY OF METCALF'S DEFENSE ........................30

CONCLUSION ...............................................................................37

CERTIFICATE OF FILING AND SERVICE .......................................38

Fed. R. App. P. 32(a)(7) AND 8th CIR. RULE 28A(c) CERTIFICATION...........39

iii

Appellate Case: 16-4006    Page: 3    Date Filed: 12/21/2016 Entry ID: 4482350

# TABLE OF AUTHORITIES

**Federal Cases:**

*Black v. United States*, 309 F.2d 331 (8th Cir. 1962) ...................................... 34-35

*Bond v. United States*, 134 S. Ct. 2077 (2014) ...................................... 23

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ................................... 16, 20

*Cohens v. Virginia,* 6 Wheat. 264, 5 L. Ed. 257 (1821) .........................................23

*Edgington v. United States*, 164 U.S. 361 (1896) ............................................ 33, 34

*Hodges v. United States*, 203 U.S. 1 (1906) ............................................ 15

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................. 29

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) ................................................. 15

*Marbury v. Madison*, 5 U.S. 137 (1803).................................................... 16

*Marbury v. Madison*, 1 Cranch 137, 2 L. Ed. 60 (1803) .................................. 24-25

*Michelson v. United States*, 335 U.S. 469 (1948) ...................................... 33-34, 34

*New York v. United States*, 505 U.S. 144 (1992) ...................................... 22-23, 23

*Oertle v. United States*, 370 F.2d 719 (10th Cir. 1966) ........................................ 35

*Pollock v. Williams*, 322 U.S. 4 (1944) ......................................... 21-22

*Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 112 S. Ct. 820, 117 L. Ed. 2d 51 (1992) ............................................................. 17

*Salinger v. United States*, 23 F.2d 48 (8th Cir. 1927) ..................................... 31-32

*Shelby County v. Holder*, 133 S. Ct. 2612 (2013) ..................................... 16, 17, 21

*Spangler v. United States*, 487 U.S. 1224 (1988)...................................................33

Appellate Case: 16-4006    Page: 4    Date Filed: 12/21/2016 Entry ID: 4482350

*United States v. Birdine*, 515 F.3d 842 (8th Cir. 2008) ........................................ 25

*United States v. Bledsoe*, 728 F.2d 1094 (8th Cir. 1984) ................................ 17, 18

*United States v. Burke*, 781 F.2d 1234 (7th Cir. 1985) ........................................ 35

*United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014) ... 13, 14, 15, 17, 19, 20, 21

*United States v. Coleman*, 584 F.3d 1121 (8th Cir. 2009) ..................................... 25

*United States v. Coppock*, 765 F.3d 921 (8th Cir. 2014) ....................................... 13

*United States v. Daily*, 921 F.2d 994 (10th Cir. 1990) .......................................... 32

*United States v. Darland*, 626 F.2d 1235 (5th Cir. 1980) ..................................... 32

*United States v. Enmons*, 410 U.S. 396 (1973).....................................................23

*United States v. Foley*, 598 F.2d 1323 (4th Cir. 1979) .......................................... 35

*United States v. Frischling*, 160 F.2d 370 (3d Cir. 1947) ..................................... 32

*United States v. Gianakos*, 415 F.3d 912 (8th Cir. 2005) ..................................... 30

*United States v. Hatch*, 722 F.3d 1193 (10th Cir. 2013) ................................ 17, 20

*United States v. Huddleston*, 811 F.2d 974 (6th Cir. 1987) ................................. 32

*United States v. John*, 309 F.3d 298 (5th Cir. 2002) ................................ 32, 33, 35

*United States v. Krapp*, 815 F.2d 1183 (8th Cir.) ........................................... 34, 36

*United States v. Lewis*, 482 F.2d 632 (D.C. Cir. 1973) ........................................ 35

*United States v. Lopez*, 514 U.S. 549 (1995) ........................................................ 23

*United States v. Maybee*, 687 F.3d 1026 (8th Cir. 2012) ...................................... 17

*United States v. Morrison*, 529 U.S. 598 (2000) .................................................. 23

Appellate Case: 16-4006    Page: 5    Date Filed: 12/21/2016 Entry ID: 4482350

*United States v. Pizano*, 421 F.3d 707 (8th Cir. 2005) ........................................... 25

*United States v. Pujana-Mena*, 949 F.2d 24 (2d Cir. 1991) ........................... 33, 35

*United States v. Spears*, 454 F.3d 830 (8th Cir. 2006) ......................................... 25

*United States v. Stanko*, 491 F.3d 408 (8th Cir. 2007) ......................................... 18

*United States v. Stanley*, 109 U.S. 3 (1883) ..................................................... 14, 15

*United States v. Tom*, 565 F.3d 497 (8th Cir. 2009) ............................................... 23

**Federal Statutes:**
18 U.S.C. § 245(b)(2)(B) (2012) .......................................................................... 17

18 U.S.C. § 249 (2012) ........................................................................................ 13

18 U.S.C. § 249(a)(1) (2012) ............................................................................... 13

18 U.S.C. § 1031 (2012) ................................................................................. 17, 18

**Other:**
H.R. Rep. No. 111-86 pt. 1 (2009) ...................................................................... 24

Jennifer Mason McAward, *Congressional Authority to Interpret the Thirteenth Amendment: A Response to Professor Tsesis*, 71 Md. L. Rev. 60, 61 (2011) ....... 21

1A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions: Criminal* § 15.15 (6th ed. 2015).................................................................... 35-36

vi

Appellate Case: 16-4006    Page: 6    Date Filed: 12/21/2016 Entry ID: 4482350

# JURISDICTIONAL STATEMENT

The decision appealed:  Defendant Randy Metcalf appeals from the judgment of conviction and sentence entered against him on October 5, 2016, in the Northern District of Iowa, on a charge of a federal hate crime.  Metcalf appeals his conviction.

Jurisdiction of the court below:  The United States District Court had jurisdiction over Metcalf's federal criminal case pursuant to 18 U.S.C. § 3231:  "The district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States."

Jurisdiction of this Court:  This Court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291:  "The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."

Metcalf filed a Notice of Appeal on October 20, 2016. (DCD 153)[2].  On October 24, 2016, Metcalf filed a Motion for Extension of Time to file a Notice of Appeal. (DCD 157).  The court granted his request, finding the Notice of Appeal was timely filed. (DCD 32); *see* Fed. R. App. P. 4(b)(4).

---

[2]  In this brief, the following abbreviations will be used:
"DCD" -- district court clerk's record, followed by docket entry and page number, where noted;
"PSR" -- presentence report, followed by the page number of the originating document and paragraph number, where noted;
"Trial Tr." – Trial transcript, followed by volume and page number.
"Sent. Tr." – Sentencing hearing transcript, followed by page number.

Appellate Case: 16-4006     Page: 7     Date Filed: 12/21/2016 Entry ID: 4482350

# STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**I. WHETHER SECTION 249(a)(1) OF THE HATE CRIMES ACT IS UNCONSTITUTIONAL BECAUSE IT IS AN INVALID EXERCISE OF CONGRESS'S LAWMAKING AUTHORITY.**

1. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968)
2. *City of Boerne v. Flores*, 521 U.S. 507 (1997)
3. *Shelby County v. Holder*, 133 S. Ct. 2612 (2013)
4. *United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014)

**II. WHETHER INSUFFICIENT EVIDENCE EXISTS TO SUPPORT METCALF'S CONVICTION BECAUSE THE VICTIM'S RACE DID NOT PLAY THE DETERMINATIVE ROLE IN THE ASSAULT.**

1. *Jackson v. Virginia*, 443 U.S. 307 (1979)

**III. WHETHER THE DISTRICT COURT'S REFUSAL TO GIVE A CHARACTER EVIDENCE INSTRUCTION IS REVERSIBLE ERROR, AS THIS WAS THE MAIN THEORY OF METCALF'S DEFENSE.**

1. *Salinger v. United States*, 23 F.2d 48 (8th Cir. 1927)
2. *United States v. Daily*, 921 F.2d 994 (10th Cir. 1990)
3. *United States v. John*, 309 F.3d 298 (5th Cir. 2002)

1

## STATEMENT OF THE CASE

Nature of the Case: This is a direct appeal by defendant Randy Metcalf following a jury trial in the Northern District of Iowa. Metcalf appeals his conviction.

Factual and Procedural Background – Pretrial: On December 15, 2015, the grand jury indicted Metcalf with one count of committing a federal hate crime, in violation of 18 U.S.C. § 249(a)(1). (DCD 2). The indictment alleged that on January 12, 2015, Metcalf "willfully caused bodily injury to [Lamarr Sandridge] who is African American, because of [Lamarr Sandridge's] actual or perceived race, color, and national origin." (DCD 2).

Metcalf filed a motion to dismiss the indictment, arguing that Congress lacked constitutional authority to enact the hate crimes statute. (DCD 15). Metcalf argued that § 249(a)(1) is an invalid exercise of Congress's power to enforce the Thirteenth Amendment, and therefore unconstitutional. (DCD 15). The government resisted. (DCD 16). The district court denied Metcalf's motion to dismiss. (DCD 21).

Factual and Procedural Background – Trial: The case proceeded to jury trial. Below is a summary of the facts presented at trial.

On the night of January 11, 2015, Lamarr Sandridge was assaulted at the Northside Bar in Dubuque, Iowa, by Metcalf and Jeremy and Joseph Saunders.

2

The trial revolved around the interactions between two groups throughout the evening. The first group included Lamarr, Katie Flores, and Sarah Kiene. The second group included Metcalf, his fiancé Noelle Weyker, Jeremy Saunders, and Jeremy's son Joseph Saunders.

Katie and Sarah were dropped off at the bar between seven and eight in the evening. (Trial Tr. Vol. II pp. 190, 200). Sarah had been drinking since noon. (Trial Tr. Vol. II p. 199). Lamarr was already at the bar, and Katie and Sarah joined Lamarr. (Trial Tr. Vol. II p. 191). Metcalf and Noelle arrived at the bar later. (Trial Tr. Vol. II p. 192). Jeremy recognized Metcalf at the bar, and Jeremy and Joseph joined Noelle and Metcalf. (Trial Tr. Vol I. p. 141-42).

Becky Burks was bartending that night and started working at 5:00 p.m. (Trial Tr. Vol. I p. 58). January 11 was Becky's first night bartending alone. (Trial Tr. Vol. I p. 28). Ted Stackis owned the Northside Bar, and was also present for the first part of that evening.[3] (Trial Tr. Vol. I p. 28).

**Jukebox Incident:** At the bar, Lamarr, Katie, and Sarah were playing darts and drinking alcohol. (Trial Tr. Vol. I p. 107). Around 10:00 p.m., Noelle put money in the jukebox. (Trial Tr. Vol. II p. 305). She momentarily stepped away from the jukebox, and Katie and Sarah allegedly used Noelle's credits to play songs on the jukebox. (Trial Tr. Vol. II p. 306). Metcalf approached Katie and

---

[3] Ted left the bar at midnight, before the assault. (Trial Tr. Vol. I p. 42).

Appellate Case: 16-4006     Page: 10     Date Filed: 12/21/2016 Entry ID: 4482350

Sarah and accused them of using Noelle's credits for the jukebox. (Trial Tr. Vol. II p. 192-93).

According to Sarah, Metcalf then started calling them "bitches." (Trial Tr. Vol. II p. 193). Metcalf would leave Katie and Sarah, and then return and continue to argue. (Def. Ex. B, Video 1)[4]. He would also apologize. (Trial Tr. Vol. I p. 193). During this back and forth, Metcalf called the two women "fucking cunts." (Trial Tr. Vol. II p. 194). Becky testified that Metcalf used the words "nigger-loving whore" during the jukebox dispute. (Trial Tr. Vol. I pp. 64-65, 69). This differed from Becky's initial statement to police, in which she indicated Metcalf used the words "dumb cunt." (Trial Tr. Vol. I pp. 96-97). Only Becky testified that Metcalf used the word "nigger" during this argument. Lamarr did not remember anyone using racial slurs. (Trial Tr. Vol. I p. 112).

Lamarr asked Metcalf to stop using this language towards the women. (Trial Tr. Vol. II pp. 194-95). Metcalf shoved Lamarr. (Def. Ex. B, Video 1, 11:00 p.m.). Metcalf then walked away, and Katie and Sarah followed him while pointing and yelling. (Def. Ex. B, Video 1, 11:01 p.m.). The back and forth briefly continued, and Becky and Ted intervened and separated the two groups. (Def. Ex. B, Video 1,

---

[4] Defendant's Exhibit B is seven surveillance videos of the bar. The citations to this exhibit will include the video number, as well as the time stamp listed at the top of the video.

Appellate Case: 16-4006   Page: 11   Date Filed: 12/21/2016 Entry ID: 4482350

11:01 p.m.). Ted tried to calm Katie and Sarah, and in response Sarah shoved Ted. (Def. Ex. B, Video 1, 11:02:35 p.m.).

Soon after, Metcalf walked over to Lamarr. (Def. Ex. B, Video 1, 11:04 p.m.). The two talked, shook hands and hugged, and went their separate ways. (Trial Tr. Vol. I p. 110; Def. Ex. B, Video 1, 11:04 p.m.). The situation then calmed down. (Trial Tr. Vol. II p. 195).

Ted claimed that after this incident Metcalf walked up to him. (Trial Tr. Vol. I p. 35). He testified Metcalf started talking about how he "burned crosses with the McDermotts." (Trial Tr. Vol. I p. 35). Ted claimed that Metcalf also stated "I hate fucking niggers" and "you got any you want taken care of." (Trial Tr. Vol. I pp. 35-36, 38). John Lugrain, who was seated nearby this conversation, did not hear any racial slurs used. (Trial Tr. Vol. II pp. 289-92). Nobody was asked to leave after the jukebox incident. (Trial Tr. Vol. I p. 92).

**Outside conversation between Metcalf and bar owner Ted Stackis:**
After the jukebox incident, Ted testified he went outside with Metcalf. (Trial Tr. Vol. I pp. 39-40). The two smoked pot together. (Trial Tr. Vol. I pp. 39-40). Ted testified that Metcalf lifted up his t-shirt to reveal a swastika tattoo on his stomach and that Metcalf then and stated "I hate them fuckers." (Trial Tr. Vol. I p. 40). After this conversation outside, Ted bought Metcalf a drink. (Trial Tr. Vol. I p. 49, Def. Ex. B, Video 3).

5

Appellate Case: 16-4006    Page: 12    Date Filed: 12/21/2016 Entry ID: 4482350

**Assault:** While initially the situation had calmed down, tensions increased between the two parties as the night progressed. (Trial Tr. Vol. II p. 196). Katie and Sarah were both very intoxicated by the end of the evening. (Trial Tr. Vol. II pp. 171-72). Katie and Sarah appeared "wobbly" and had impaired speech. (Trial Tr. Vol. II pp. 214-15; Def. Ex. B, Video 5). Throughout the night, Katie and Sarah were yelling and swearing at Metcalf. (Trial Tr. Vol. I p. 145). Ted eventually had to again intervene and tell Katie and Sarah to stop their behavior. (Trial Tr. Vol. II p. 201).

As tensions increased, Sarah said that Metcalf repeatedly called them "nigger lovers." (Trial Tr. Vol. II p. 196). According to Ted, Metcalf called Katie and Sarah "nigger-loving cunts." (Trial Tr. Vol. I p. 33). Katie testified that Metcalf called her a "cunt, nigger lover, and bitch." (Trial Tr. Vol. I p. 123). Katie told Becky that Metcalf had called her a "nigger lover," and in response Becky commented that she had a "mixed son." (Trial Tr. Vol. I p. 126).

Jeremy testified that Metcalf was calling Lamarr a "stupid nigger" and Katie and Sarah "nigger-loving cunts." (Trial Tr. Vol. I pp. 143-44). At trial Jeremy testified that Metcalf used the word "nigger" repeatedly; however, Jeremy originally told law enforcement that Metcalf only used the word once. (Trial Tr. Vol. I p. 145-46). When interviewed by police after the incident, Jeremy stated he did not precisely remember what Metcalf called the women. (Trial Tr. Vol. II pp.

6

Appellate Case: 16-4006    Page: 13    Date Filed: 12/21/2016 Entry ID: 4482350

174-75). Jeremy also testified that Metcalf mentioned cross burnings. (Trial Tr. Vol. I p. 144). He testified that Metcalf lifted up his shirt to show his swastika tattoo. (Trial Tr. Vol. I p. 147). Finally, he testified that Metcalf stated that he told Ted he could take "care of any niggers." (Trial Tr. Vol. I pp. 149-50).

The more intoxicated Katie got, the more she was "ranting and raving." (Trial Tr. Vol. II p. 175). Katie continued to attempt to antagonize Metcalf. (Trial Tr. Vol. II p 173, Def. Ex. B, Video 7, 1:15 a.m.). Metcalf tried to ignore Katie, but she persisted in her behavior. (Trial Tr. Vol. II p. 173). Becky eventually intervened again. (Def. Ex. B, Video 7, 1:15 a.m.). Katie then ran up to Metcalf, yelling and pointing in his face. (Def. Ex. B, Video 7, 1:16 a.m.). Metcalf did not react to Katie, and instead stood with his hands in his pockets. (Def. Ex. B, Video 7, 1:16 a.m.). Lamarr eventually dragged Katie away from Metcalf. (Trial Tr. Vol. II p. 177, Def. Ex. B, Video 7, 1:16 a.m.).

Soon after Katie had to be dragged away, Sarah walked over to Metcalf, shoved him, and told him to "shut the fuck up." (Trial Tr. Vol. II p. 196-97). Noelle was recording Sarah with her cellphone. (Trial Tr. Vol. II p. 196-97). Katie came up behind Noelle and knocked the phone out of her hand. (Trial Tr. Vol. I p. 84). After this, a fight broke out. (Trial Tr. Vol. II p. 197).

Metcalf charged Katie, grabbed her by the hair, and dragged her down to the ground. (Def. Ex. B., Video 7, 1:19 a.m.). Lamarr ran over and punched Metcalf

Appellate Case: 16-4006    Page: 14    Date Filed: 12/21/2016 Entry ID: 4482350

two or three times in the back of the head. (Def. Ex. B, Video 7, 1:19 a.m.). In response, Jeremy put Lamarr in a headlock. (Trial Tr. Vol. I p. 150, Def. Ex. B, Video 7, 1:19 a.m.). Joseph then punched Lamarr in the face over 10 times. (Trial Tr. Vol. I p.150, Def. Ex. B, Video 7, 1:19 a.m.). Lamarr was unconscious after Joseph stopped punching him. (Trial Tr. Vol. I p. 151). After Jeremy released Lamarr from the headlock, Metcalf stood up and repeatedly kicked Lamarr in the head. (Def. Ex. B, Video 7, 1:19 a.m.). Becky shoved Metcalf away from Lamarr. (Def. Ex. B, Video 7, 1:19 a.m.). Becky then went back to the bar to call 911. (Trial Tr. Vol. I pp. 87-88).

After Metcalf kicked Lamarr, Metcalf, Jeremy, and Joseph started to leave the bar. (Def. Ex. B, Video 7, 1:20 a.m.). Metcalf returned to get his coat, and then kicked Lamarr in the head again. (Def. Ex. B, Video 7, 1:20 a.m.). Sarah shoved Metcalf away from Lamarr, and he responded by hitting her in the head. (Def. Ex. B, Video 7, 1:20 a.m.). Becky claims Metcalf stated "die nigger die" during the assault. (Trial Tr. Vol. I p. 73). Metcalf, Jeremy, Joseph, and Noelle then left the bar. (Def. Ex. B, Video 7, 1:20 a.m.).

After law enforcement arrived, Katie and Sarah told the officers they were going outside to have a cigarette. (Trial Tr. Vol. II pp. 204-05). However, the two then snuck out the back and ran home. (Trial Tr. Vol. II pp. 204-05). Jeremy testified that after the assault he, Joseph, and Metcalf returned to Jeremy's home.

8

(Trial Tr. Vol. I pp. 153-54). Once at Jeremy's home, Metcalf stated that "the nigger got what was coming to him." (Trial Tr. Vol. I pp. 153-54).

The next day, Becky reviewed the events of the evening with Ted and Ted's wife, Darla. (Trial Tr. Vol. I p. 98). Sarah also reviewed the events Darla, who had watched the surveillance footage. (Trial Tr. Vol. II p. 205).

**Character Evidence:** The defense put on various witnesses to discuss Metcalf's character and also to discuss his swastika tattoos. The testimony involved discussions of his interactions and friendships with African Americans in his personal and work life, as well as while he was previously incarcerated at Anamosa State Penitentiary.

Randy Caspers and Ricky Frankfurt, former correctional employees at Anamosa State Penitentiary, testified that Metcalf did not have issues with the African-American inmates while incarcerated. (Trial Tr. Vol. II pp. 234, 262-64). Former co-workers of Metcalf's also testified. Metcalf worked security at a night club with predominantly African American clientele. (Trial Tr. Vol. II pp. 274-75). Two former coworkers testified that Metcalf never acted inappropriately with African-American patrons and never used excessive force. (Trial Tr. Vol. II. p. 276).

Friends of Metcalf, including Kelton Williams, an African-American man who is close friends with Metcalf, testified regarding his interactions with African

9

Americans, and provided opinion testimony that he was not racist. (Trial Tr. Vol. II pp. 247-50, 255-58). K.D. also testified. Metcalf dated K.D.'s mother. (Trial Tr. Vol. II p. 240). Metcalf was not K.D.'s biological father, but Metcalf raised K.D. like he was his own son. (Trial Tr. Vol. II p. 241). K.D.'s biological father is black, and his mother is white. (Trial Tr. Vol. II p. 243). Metcalf remained in K.D.'s life even after Metcalf's relationship with K.D.'s mother ended. (Trial Tr. Vol. II pp. 241-42).

K.D. was aware of Metcalf's swastika tattoo. (Trial Tr. Vol. II p. 242). Metcalf was embarrassed of his tattoo and hoped to have the tattoo covered up. (Trial Tr. Vol. II p. 242). K.D. knew Metcalf got this tattoo while in prison. (Trial Tr. Vol. II p. 242). At Anamosa State Penitentiary, where Metcalf was once incarcerated, 50-60% of the white inmates had swastika or white power tattoos. (Trial Tr. Vol II. p. 271). Inmates could be pressured into getting these kinds of tattoos. (Trial Tr. Vol. II p. 271).

The parties stipulated that Metcalf had willfully caused bodily injury to Lamarr. (Trial Tr. Vol. II pp. 186-88).

Factual and Procedural Background – Post-trial and Sentencing: The jury convicted Metcalf of the offense as charged. (DCD 101). Metcalf filed a motion for judgment of acquittal or, alternatively a motion for a new trial arguing the

10

evidence did not establish that he assaulted Lamarr because of his race. (DCD 105).  The district court denied the motion. (DCD 109).

The case proceeded to sentencing.  A presentence investigation report (PSR) was created.  The PSR originally calculated Metcalf's sentencing range as 100 to 120 months of imprisonment, based on a total offense level of 24 and criminal history category VI. (PSR ¶ 126).  Metcalf and the government both filed several objections to the PSR. (DCD 118, 119).

After ruling on the objections, the district court initially calculated Metcalf's sentencing range as 92 to 115 months of imprisonment, based on a total offense level of 23 and criminal history category VI. (Sent Tr. p. 11).  The district court then granted the government's request for an upward departure under USSG § 4A1.3, increasing his total offense level to 24. (Sent. Tr. p. 16).  Metcalf's final guideline range was 100 to 120 months of imprisonment. (Sent. Tr. p. 16).  The district court sentenced Metcalf to 120 months of imprisonment – the statutory maximum. (Sent. Tr. p. 22).  In doing so, the district court stated that the sentence would be the same even if any guideline calculation errors were made. (Sent. Tr. p. 21).  Metcalf now appeals.

Appellate Case: 16-4006     Page: 18     Date Filed: 12/21/2016 Entry ID: 4482350

## SUMMARY OF THE ARGUMENT

Metcalf raises three arguments on appeal. First, he argues the district court erred in denying his motion to dismiss the indictment. Section 249(a)(1) of the hate crimes act is unconstitutional, because it is an invalid exercise of Congress's power. Recent U.S. Supreme Court case law illustrates that Congress's power to legislate based on § 2 of the Thirteenth Amendment is limited, and § 249(a)(1) exceeds the scope of that power.

Second, Metcalf asserts that insufficient evidence was presented to support his conviction. Specifically, Metcalf argues the government failed to meet its burden to establish he assaulted Lamarr Sandridge because of his race. Finally, Metcalf argues that the district court's failure to provide an instruction on character evidence is reversible error. Metcalf's character evidence was the main part of his defense, and the jury received no instructions whatsoever on how to consider this evidence.

12

Appellate Case: 16-4006   Page: 19   Date Filed: 12/21/2016 Entry ID: 4482350

**ARGUMENT**

I. **SECTION 249(a)(1) OF THE HATE CRIMES ACT IS UNCONSTITUTIONAL BECAUSE IT IS AN INVALID EXERCISE OF CONGRESS'S LAWMAKING AUTHORITY.**

Standard of Review: This Court reviews the denial of a motion to dismiss the indictment *de novo. United States v. Coppock*, 765 F.3d 921, 922 (8th Cir. 2014).

Merits: Metcalf asserts that the district court erred in denying his motion to dismiss the indictment. Section 249(a)(1) is an invalid exercise of Congress's power to enforce the Thirteenth Amendment, and is therefore unconstitutional.

**a.** **History of the Hate Crimes Act:** In 2009, Congress enacted the Hate Crimes Act, 18 U.S.C. § 249 (2012). Section 249(a)(1) states:

> **(1) Offenses involving actual or perceived race, color, religion, or national origin.**—Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person . . . [shall be subject to penalties].

In passing 18 U.S.C. § 249(a)(1), Congress expressly relied on the Thirteenth Amendment for its authority. *United States v. Cannon*, 750 F.3d 492, 497-98 (5th Cir. 2014). "Section 249(a)(1) is distinct from the second part of the Shepard-Byrd Act, which applies to other categories of hate crimes, and rests on

13

different constitutional sources of congressional authority." *Id.* While "Congress passed § 249(a)(2) under § 5 of the Fourteenth Amendment and the Commerce Clause," the same is not true for § 249(a)(1). *Id.* "In contrast, § 249(a)(1) rests solely on Congress's authority under § 2 of the Thirteenth Amendment." *Id.*

The Thirteenth Amendment states:

**Section 1.** Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

**Section 2.** Congress shall have power to enforce this article by appropriate legislation.

**b.      Recent U.S. Supreme Court case law limits Congress's power to legislate under § 2 of the Thirteenth Amendment, and § 249(a)(1) exceeds that power.**

The U.S. Supreme Court's interpretation of the scope of § 2 of the Thirteenth Amendment—the enforcement provision—has changed over time. The Court first analyzed § 2 in *The Civil Rights Cases, United States v. Stanley*, 109 U.S. 3, 20 (1883).  The Court stated:

It is true, that slavery cannot exist without law, any more than property in lands and goods can exist without law: and, therefore, the Thirteenth Amendment may be regarded as nullifying all State laws which establish or uphold slavery. But it has a reflex character also, establishing and decreeing universal civil and political freedom throughout the United States; and it is assumed, that the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States:

14

Appellate Case: 16-4006      Page: 21      Date Filed: 12/21/2016 Entry ID: 4482350

*Id.* (emphasis added).  The Court then rejected the argument that Congress could rely on § 2 of the Thirteenth Amendment to outlaw discrimination in public accommodations. *Id.*  In doing so, the Court reasoned that discrimination in public accommodations had "nothing to do with slavery or involuntary servitude." *Id.* at 24.

Consistent with *The Civil Rights Cases*, *Hodges v. United States*, 203 U.S. 1, 27 (1906), the U.S. Supreme Court determined that the scope of the enforcement provision was "as clear as language can make it. The things denounced are slavery and involuntary servitude, and Congress is given power to enforce that denunciation. All understand by these terms a condition of enforced compulsory service of one to another" *Id.* at 16.

However, the U.S. Supreme Court's interpretation of the breadth of § 2 of the Thirteenth Amendment changed in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). *See Cannon*, 750 F.3d at 499-500 (discussing the U.S. Supreme Court's change in analysis).  In *Jones*, the Court relied on the "badges and incidents of slavery" language from *The Civil Rights Cases* and held that Congress had the authority to abolish the "badges and incidents of slavery." *Id.* at 440.  However, the Court went further, and determined Congress also had the power to "rationally determine" what *are* the badges and incidents of slavery. *Id.*

In the time since *Jones*, the U.S. Supreme Court has pulled back on

15

Appellate Case: 16-4006     Page: 22     Date Filed: 12/21/2016 Entry ID: 4482350

Congress's power to legislate under the other "Reconstruction Amendments," specifically the Fourteenth and Fifteenth Amendments.  First, in *City of Boerne v. Flores*, 521 U.S. 507, 517 (1997), the Court interpreted the scope of Congress's enforcement powers under § 5 of the Fourteenth Amendment, which is almost identical to § 2 of the Thirteenth Amendment.  The Court determined that the enforcement provision was clearly only remedial. *Id.* at 528.  The Court stated:

> If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be "superior paramount law, unchangeable by ordinary means." It would be "on a level with ordinary legislative acts, and, like other acts, . . . alterable when the legislature shall please to alter it." *Marbury v. Madison*, 5 U.S. 137 (1803).  Under this approach, it is difficult to conceive of a principle that would limit congressional power.

*Id.* at 529.  This directly conflicts with *Jones's* holding that Congress can determine what are the badges and incidents of slavery—essentially allowing it to define its own power—and legislate accordingly.

More recently, the Court decided *Shelby County v. Holder*, 133 S. Ct. 2612 (2013).  *Shelby County* involved various challenges to the Voting Rights Act of 1965 and required the Court to analyze the scope of the enforcement provision of the Fifteenth Amendment (which again, is almost identical to § 2 of the Thirteenth Amendment). *Id.* .  The Court held that to justify use of the enforcement provision of the Fifteenth Amendment, any legislation must be based on current, not past, conditions. *Id.*  The Court stated:

16

> Congress may draft another formula based on current conditions. Such a formula is an initial prerequisite to a determination that exceptional conditions still exist justifying such an "extraordinary departure from the traditional course of relations between the States and the Federal Government." *Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 500-01, 112 S. Ct. 820, 117 L. Ed. 2d 51 (1992). Our country has changed, and while any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions.

*Id.* at 2631 (internal quotation marks omitted).

Circuits to decide the issue have upheld constitutional challenges to § 249(a)(1), finding that *Jones* is binding precedent despite *Flores* and *Shelby County*. *Cannon*, 750 F.3d 492; *United States v. Hatch*, 722 F.3d 1193 (10th Cir. 2013).[5] However, this is an open question in the Eighth Circuit. The closest the Circuit came to analyzing a constitutional challenge to § 249(a)(1) was *United States v. Maybee*, 687 F.3d 1026 (8th Cir. 2012). In *Maybee*, a defendant raised a "narrow challenge" to § 249(a)(1). The defendant recognized that in *United States v. Bledsoe*, 728 F.2d 1094 (8th Cir. 1984), the Eighth Circuit upheld 18 U.S.C. § 245(b)(2)(B), a similar statute to § 249(a)(1), as an appropriate exercise of Congress's Thirteenth Amendment enforcement power. *Id.* at 1031. However, the defendant argued that *Bledsoe* "relied on two statutory elements—that the willful infliction of injury be motivated by the victim's race and by the victim's enjoyment of a public benefit" and held that these elements "are necessary to justify the

---

[5] *Hatch* does not discuss *Shelby County*.

17

Appellate Case: 16-4006    Page: 24    Date Filed: 12/21/2016 Entry ID: 4482350

exercise of Congress's Thirteenth Amendment enforcement power." *Id.* Because §

249(a)(1) does not include these elements, the defendant in *Bledsoe* argued §

249(a)(1) is unconstitutional. *Id.*

The Eighth Circuit rejected this argument on error preservation grounds

because the defendant failed to provide any substantive argument:

> While Maybee argues that § 249(a)(1) sweeps more broadly than § 245(b)(2)(b), he provides no substantial argument as to why the particular scope of § 249(a)(1) renders it constitutionally infirm. *See United States v. Stanko*, 491 F.3d 408, 415 (8th Cir. 2007) (refusing to address issues not substantively argued by a defendant).

Therefore, whether § 249(a)(1) is a valid exercise of Congress's Thirteenth

Amendment enforcement power is an open question in the Eighth Circuit.

On this issue of first impression, Metcalf asserts this Court should reject the

holdings of the circuits to uphold § 249(a)(1). These cases erroneously determine

that *Jones* is still good law. First, *Flores* has overruled *Jones*, which allowed

Congress to unilaterally determine the scope of § 2 of the Thirteenth Amendment

and legislate as it saw fit. Although *Flores* does not explicitly discuss the

Thirteenth Amendment or *Jones*, it clearly pulls back on the scope of the

enforcement provision under an almost identical constitutional provision. After

*Flores*, Congress no longer has the ability to determine the scope of its

constitutional authority, and Congress's power under § 2 of the Thirteenth

Amendment is limited to adopting legislation to prohibit slavery and involuntary

Appellate Case: 16-4006     Page: 25     Date Filed: 12/21/2016 Entry ID: 4482350

servitude.  Section 249(a)(1) goes beyond this power.

Second, *Shelby County* requires a finding that § 249(a)(1) was justified by current conditions before it can be deemed a necessary enforcement provision under the Thirteenth Amendment.  Congress did not present *current* findings that § 249(a)(1) is necessary to enforce the Thirteenth Amendment.  "In passing § 249(a)(1), Congress focused on past conditions and did not make any findings that current state laws, or the individuals charged with enforcing them, were failing to adequately protect victims from racially-motivated crimes." *Cannon*, 750 F.3d at 510 (Elrod, J., concurring).

While *Flores* and *Shelby County* are not explicitly interpreting the Thirteenth Amendment, their analysis still applies to the amendment.  The Reconstruction Amendments all ""a unity of purpose, when taken in connection with the history of the times, which cannot fail to have an important bearing on any question of doubt concerning their true meaning" *Id.* at 509 (Elrod, J., concurring).  If this Court does not determine that *Jones* has been overruled, Metcalf asserts that it should be overruled.[6]

Even the circuits to uphold the statute under constitutional attack note the weakness of the argument that Congress had the authority to pass § 249(a)(1) under the Thirteenth Amendment.  For example, in response to the defendant's

---

[6] Metcalf makes this argument for error preservation purposes.

Appellate Case: 16-4006     Page: 26     Date Filed: 12/21/2016 Entry ID: 4482350

arguments that *Jones's* interpretation of the Thirteenth Amendment violated basic federalism principles, the Tenth Circuit stated:

> At its core, [the defendant's] argument raises important concerns we share. "Badges and incidents of slavery," taken at face value, puts emphasis solely on the conduct Congress seeks to prohibit, and it seems to place few limits on what that conduct might be. Given slaves' intensely deplorable treatment and slavery's lasting effects, nearly every hurtful thing one human could do to another and nearly every disadvantaged state of being might be analogized to slavery— and thereby labeled a badge or incident of slavery under Jones's rational determination test. In effect, this interpretation gives Congress the power to define the meaning of the Constitution—a rare power indeed. *See City of Boerne*, 521 U.S. at 529. And many legal scholars have encouraged broad use of Section 2 power in essentially this way, which would arguably raise the sort of federalism concerns articulated in City of Boerne, Lopez, and Morrison. Others have argued for a narrower interpretation that relates more directly to slavery as an institution rather than to any individual feature of slavery.
>
> While this debate raises worthwhile questions, the Supreme Court has never revisited the rational determination test it established in Jones.

*Hatch*, 722 F.3d at 1204.

Additionally, the majority opinion in *Cannon* recognized that the "legal landscape regarding the Reconstruction Amendments" has changed since *Jones*. *Cannon*, 750 F.3d at 505. The concurring opinion went farther, noting the strength of the argument that *Jones's* expansive view of § 2 of the Thirteenth Amendment may no longer be good law. *Id. a*t 509 (Elrod, J., concurring) ("I write separately to express my concern that there is a growing tension between the Supreme Court's precedent regarding the scope of Congress's powers under § 2 of the Thirteenth

20

Amendment and the Supreme Court's subsequent decisions regarding the other Reconstruction Amendments and the Commerce Clause."); *see also* Jennifer Mason McAward, *Congressional Authority to Interpret the Thirteenth Amendment: A Response to Professor Tsesis*, 71 Md. L. Rev. 60, 61 (2011) ([T]he viability of *Jones* is questionable in light of *City of Boerne v. Flores*.").  The concurrence recognized that *Jones's* holding that Congress can determine the "badges and incidents of slavery" is inconsistent with later U.S. Supreme Court case law. *Cannon*, 750 F.3d at 499 (Elrod, J., concurring) ("Under our existing Thirteenth Amendment jurisprudence, it has indeed become difficult to conceive of a principle that would limit congressional power.").  Additionally, the concurrence noted that because the Hate Crimes Act "'imposes current burdens,' perhaps, like the Voting Rights Act, it too 'must be justified' with congressional findings regarding 'current needs.'" *Cannon*, 750 F.3d at 511 (Elrod, J., concurring) (quoting *Shelby County v. Holder*, 133 S. Ct. 2612, 2619 (2013))).

Even if *Jones* is still good law, § 249(a)(1) is not a badge and incident of slavery and therefore not a valid exercise of the Thirteenth Amendment.  A hate crime is not a badge or incident of slavery as contemplated by the Thirteenth Amendment, because the focus of the Amendment, beyond ending slavery and involuntary servitude, was economic rights of former slaves. *See Pollock v. Williams*, 322 U.S. 4, 17 (1944) ("The undoubted aim of the Thirteenth

21

Amendment as implemented by the Antipeonage Act was not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States."). Section 249(a)(1) is also not written so as to limit protections to those individuals previously subject to slavery in the United States, specifically African-Americans. Under this statute, an African American individual can be convicted for an offense against a Caucasian individual. Clearly such a prosecution would have no connection whatsoever to the Thirteenth Amendment's goal of protecting the economic rights of those previously subject to slavery or involuntary servitude.

### c. Section 249(a)(1) is an impermissible attempt to exercise a federal police power and violates fundamental principles of federalism.

Because Metcalf's challenge involves a question of "division of authority between federal and state governments," the analysis should also consider whether § 249(a)(1) is consistent with the Tenth Amendment and federalism principles. *New York v. United States*, 505 U.S. 144, 155-56 (1992) ("The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States."). The Tenth Amendment "is a mere affirmation of what, upon any just

22

Appellate Case: 16-4006   Page: 29   Date Filed: 12/21/2016 Entry ID: 4482350

reasoning, is a necessary rule of interpreting the [C]onstitution.  Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to state authorities." *Id.*

"For nearly two centuries it has been 'clear' that, lacking a police power, 'Congress cannot punish felonies generally.'" *Bond v. United States*, 134 S. Ct. 2077, 2086 (2014) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 428, 5 L. Ed. 257 (U.S. 1821)).  "Congress does not normally intrude upon the police power of the States." *Bond*, 134 S. Ct. at 2086.  "'When Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction.'" *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) (quoting *United States v. Enmons*, 410 U.S. 396, 411-12 (1973)).  Federal encroachment on a state's police power implicates the fundamental principles of the Tenth Amendment. *United States v. Tom*, 565 F.3d 497, 506-07 (8th Cir. 2009).  The U.S. Supreme Court has recently reaffirmed this principle, and rejected Congress's attempts to impose a federal police power in *United States v. Morrison*, 529 U.S. 598 (2000) and *United States v. Lopez*, 514 U.S. 549 (1995).

A review of the legislative history of § 249(a)(1) makes clear that Congress is attempting to use a police power and is thereby infringing on a power reserved to the states.  When recommending that the statute be passed, the House of

23

Appellate Case: 16-4006     Page: 30     Date Filed: 12/21/2016 Entry ID: 4482350

Representatives Committee on the Judiciary noted that "[w]here State and local prosecutors fail to bring appropriate State charges, or where State laws or State prosecutions are inadequate to vindicate the Federal interest, it is imperative that the Federal Government be able to step in and bring effective Federal prosecutions to 'backstop' State and local law enforcement." H.R. Rep. No. 111-86, pt. 1 at 8 (2009), *available at* https://www.congress.gov/congressional-report/111th-congress/house-report/86/1.  Congress cannot create a police power simply because it has concerns with how the states are using that power.

Further, a main motivation for passing § 249(a)(1) was to avoid a federal nexus requirement.  Congress was frustrated with the "limited reach of section 245(b)" which requires that a victim be engaged in a "federally protected activity." H.R. Rep. No. 111-86, pt. 1 at 7 (2009).  Congress noted that this requirement made the statute difficult to prosecute. *Id.*  Therefore, § 249(a)(1) removes the requirement of a federal nexus in order to make prosecution in federal court easier. This is improper.

In short, "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution.  The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 1 Cranch 137, 176, 2 L. Ed. 60 (U.S. 1803) (Marshall, C.J.)."  Because the Thirteenth Amendment does not provide

Appellate Case: 16-4006     Page: 31     Date Filed: 12/21/2016 Entry ID: 4482350

Congress with authority to pass § 249(a)(1), the statute is unconstitutional and the indictment should be dismissed.

## II. INSUFFICIENT EVIDENCE EXISTS TO SUPPORT METCALF'S CONVICTION BECAUSE THE VICTIM'S RACE DID NOT PLAY THE DETERMINATIVE ROLE IN THE ASSAULT.

Standard of Review: This Court reviews the sufficiency of the evidence to sustain a conviction de novo. *United States v. Birdine*, 515 F.3d 842, 844 (8th Cir. 2008). However, this Court examines the record in the light most favorable to the verdict, allowing the government all reasonable inferences that may be drawn from the evidence. *Id.* . The Court "[does] not weigh the evidence or assess the credibility of the witnesses." *United States v. Spears*, 454 F.3d 830, 832 (8th Cir. 2006) (noting that the court "must resolve credibility issues in favor of the verdict."). This Court will reverse "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Coleman*, 584 F.3d 1121, 1125 (8th Cir. 2009).

"The standard for reviewing a claim of insufficient evidence is strict, and a jury's guilty verdict should not be overturned lightly." *United States v. Pizano*, 421 F.3d 707, 719 (8th Cir. 2005).

Merits: Metcalf next asserts that the evidence was insufficient to support his conviction. At trial, it was uncontested that Metcalf had "willfully caused bodily

25

injury" to Lamarr. (Trial Tr. Vol. II pp. 186-88). The only issue for the jury was whether Metcalf caused bodily injury *because of* Lamarr's actual or perceived race, color or national origin. (DCD 99, p. 14). On this element, the jury was instructed that:

> [t]o prove that the assault occurred "because of" [Lamarr Sandridge's] actual or perceived race, color or national origin, the government must show that the assault would not have occurred but for the fact of [Lamarr Sandridge's] actual or perceived race, color or national origin. This does not mean that the government must prove that [Lamarr Sandridge's] actual or perceived race, color or national origin was the sole or only reason for the assault. You may find that the defendant is guilty even if there was more than one reason why he assaulted [Lamarr Sandridge]. The government must prove, however, that [Lamarr Sandridge's] actual or perceived race, color or national origin played the determinative role in the defendant's decision to assault him.

(DCD 99, p. 14). However, the government's evidence failed to establish that Lamarr's race was the "but for" cause of the assault.

Metcalf's assault on Lamarr was part of a bar fight; it was not a hate crime. Metcalf's assault was inexcusable, but Lamarr's race did not play the determinative role in Metcalf's decision to assault him. Metcalf's reasoning for assaulting Lamarr was the same as his reasoning for assaulting Katie and Sarah: Metcalf had a short temper and snapped on anyone in the bar who challenged him.

Multiple witnesses testified regarding Metcalf's use of the word "nigger" throughout the night. However, this testimony was unreliable. For one, all parties

26

were intoxicated. (Trial Tr. Vol I, pp. 39-40, Vol. II p. 196; Def. Ex. B, Video 6). By the end of the night, Katie and Sarah were extremely intoxicated. (Trial Tr. Vol. II p. 196).

Ted, the bar owner, claimed that Metcalf was talking about cross burnings and that outside of the bar Metcalf bragged about his swastika tattoo. However, after this conversation, Ted hugged Randy and then bought him a drink. (Def. Ex. B, Video 3, 11:16 p.m.).

Jeremy's testimony at trial was drastically different from his initial statement to police. The evidence established that he had good reason to change his testimony. When arrested, the investigator told Jeremy he should do everything to help himself out. (Trial Tr. Vol. II pp. 280-81). Jeremy was not charged in federal court, even though he used the word "nigger" repeatedly throughout the night and participated in the assault. (Trial Tr. Vol. II pp. 153, 182). Instead, Jeremy was charged with felony assault in state court, and eventually was allowed to plead guilty to misdemeanor assault. (Trial Tr. Vol. I pp. 151-52).

The testimony on the events of the night was inconsistent. Only Becky testified that Metcalf used the word "nigger" during the initial jukebox altercation. Further, Becky testified that Metcalf was saying "die nigger" as he assaulted Lamarr. (Trial Tr. Vol. I p. 73). Part of the assault is audio recorded in a 911 call. (Gov't Ex. 9). While the recording does pick up people talking in the background

27

of the 911 call, Metcalf does not state these words on the recording. (Gov't Ex. 9).
Further, Becky testified that she was not drinking that evening. (Trial Tr. Vol. I p. 59).  Surveillance video established that Becky was drinking alcohol throughout the entire evening. (Def. Ex. B, Video 6).

At least some of the individuals involved in the events of the evening met the next day.  Ted, Becky, and Sarah all discussed the events of the evening with other people present that night. (Trial Tr. Vol. I p. 98, Vol. II p. 205).  Their testimony was therefore tainted by their meeting the next day, which enabled them to review the events together.

Even with consideration of this questionable testimony, the high standard of "but for" causation is still not met.  In this very short brawl, Metcalf assaulted three people: Katie, Sarah, and Lamarr.  Throughout the night, Metcalf was calling Katie and Sarah "cunts," a derogatory word typically directed at women.  Metcalf's use of this word does not establish that his assaults on Katie and Sarah were because they were women.  The same goes for Metcalf's alleged use of the word "nigger."  Even assuming he did repeatedly use this word, it does not mean that Lamarr's race played the determinative role in Metcalf's decision to assault him.  Instead, the video makes clear why Metcalf committed these assaults: Katie, because she knocked down Noelle's phone; Lamarr, because he got in the way and punched

28

Metcalf three times; and Sarah, because she tried to shove Metcalf away from Lamarr.

While the government relied on Metcalf's swastika tattoos and testimony that Metcalf was bragging about cross burnings and using racial slurs to portray him as a racist, the defense's character witnesses refuted this evidence. The swastika tattoos were explained as a part of prison culture. The majority of white inmates at Anamosa State Penitentiary—where Metcalf got his tattoos—had some kind of white power tattoo. (Trial Tr. Vol. II p. 271). Inmates could be pressured into getting these tattoos. (Trial Tr. Vol. II p. 271).

Further, the evidence showed Metcalf did not mistreat African Americans in his former job in night club security—a job that sometimes likely required force. (Trial Tr. Vol. II p. 274-76). Metcalf even raised an African American child as if he was his own son. (Trial Tr. Vol. II p. 241).

The government had the burden to establish that the assault *would not have happened* but for Lamarr's race. (DCD 99, p. 14); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). After Noelle's phone was knocked out of her hand, Metcalf saw red and assaulted anyone who got in his path. Metcalf would have assaulted Lamarr regardless of his race; this is clear because he also assaulted two Caucasian women in the same short time frame. His conviction must be overturned.

29

Appellate Case: 16-4006    Page: 36    Date Filed: 12/21/2016 Entry ID: 4482350

**III. THE DISTRICT COURT'S REFUSAL TO GIVE A CHARACTER EVIDENCE INSTRUCTION IS REVERSIBLE ERROR, AS THIS WAS THE MAIN THEORY OF METCALF'S DEFENSE.**

Standard of Review:  This Court reviews "a district court's decision to grant or deny a request for a particular jury instruction for abuse of discretion." *United States v. Gianakos*, 415 F.3d 912, 920 (8th Cir. 2005).  In doing so, this Court determines "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Id.* (internal quotation marks omitted).  "A defendant is entitled to an instruction explaining his defense theory if the request is timely, the proffered instruction is supported by the evidence, and the instruction correctly states the law." *Id.* .  Reversal requires a showing of prejudice. *Id.* .

Merits:  At trial, the district court allowed evidence as to Metcalf's character, specifically his lack of racism.  Because of this, Metcalf requested the following instruction:

> You heard the testimony of [witness], who said that the defendant has a reputation and character for lack of racism.  Along with all of the other evidence you have heard, you may take into consideration what you believe about the defendant's lack of racism when you decide whether the government has proved, beyond a reasonable doubt, that the defendant committed the crime.  Evidence of the defendant's lack of racism alone may create a reasonable doubt whether the government proved that the defendant committed the crime.

(DCD 85, p. 33).  The district court denied the instruction, stating:

30

Appellate Case: 16-4006    Page: 37    Date Filed: 12/21/2016 Entry ID: 4482350

> In terms of [the character instruction], the Court does not think that this particular instruction is needed in this case and the instructions as a whole I think take into account what the government must prove and the ramifications of the government not so proving. I don't think it adds anything to the instructions.

(Trial Tr. Vol. II pp. 337-38). The refusal to instruct the jury on character evidence was error.

Below, the district court correctly ruled that character evidence was admissible, and that racism, or lack thereof, was a character trait. (Trial Tr. Vol. II pp. 164-65). However, because the district court refused to give the character instruction, the instructions provided by the court did not provide jurors any guidance on the purpose or appropriate uses of this character evidence.

The Eighth and many other circuits long held that when character evidence is introduced, the jury **must** be instructed on how to consider this evidence, and must also, at minimum, be instructed that character evidence can, along with other evidence, establish reasonable doubt. *Salinger v. United States*, 23 F.2d 48 (8th Cir. 1927) ("That rule was and is that, where evidence of good character is introduced in behalf of a defendant, he is entitled, and especially when a request is made, to an instruction to the effect (1) that the purpose and function of such evidence is to raise a reasonable doubt; (2) that it is entitled to be considered whether the effect of the other evidence in the case is clear or doubtful; and (3) that when it is considered with the other evidence, if a reasonable doubt is created as to

31

the defendant's guilt, he is entitled to be acquitted."); *see also United States v. Daily*, 921 F.2d 994, 1010 (10th Cir. 1990) (overruled on other grounds) ("Where [character] evidence is admitted, the defendant is entitled to an instruction in conformity with the purposes for which it is admissible."); *United States v. Huddleston*, 811 F.2d 974, 977 (6th Cir. 1987) (stating that a district court is required to give a character instruction when requested by a defendant and character evidence is introduced); *United States v. Darland*, 626 F.2d 1235, 1237 (5th Cir. 1980) (finding plain error requiring reversal where district court refused to give character instruction); *United States v. Frischling*, 160 F.2d 370, 370 (3d Cir. 1947) ("It has long been the rule that it is the duty of the trial judge to instruct the jury in substance that reputation of a defendant's good character, when put in evidence, is a fact which they should consider with other facts in the case and which, when so considered, may, like other facts, general a reasonable doubt which would justify acquittal.").

Metcalf's case is similar to *United States v. John*, 309 F.3d 298 (5th Cir. 2002), in which the Fifth Circuit Court of Appeals reversed the district court's refusal to give an instruction on character evidence. In *John*, the defendant was accused of sexual abuse of a minor, and the case boiled down to who the jury believed: the defendant or the alleged victim. *Id.* at 303. The proposed instruction "would have informed the jury it should consider evidence of good general

32

Appellate Case: 16-4006     Page: 39     Date Filed: 12/21/2016 Entry ID: 4482350

reputation for truth and veracity, or honesty and integrity, or [being a] law abiding-citizen" and further instructed the jury that "character evidence 'may give rise to a reasonable doubt, since you may think it improbable that a person of good character in respect to those traits would commit such a crime.'" *Id.* at 302.

Noting that a defendant "is usually entitled to have the court instruct the jury on the defense's theory of the case," the Fifth Circuit reversed the failure to give the instruction. *Id.* at 304. The court found that evidence of the defendant's character was a crucial aspect of his defense. *Id.* . The same logic applies here: Metcalf's sole defense was that he did not assault Lamarr because of his race, and a crucial aspect of his defense was character evidence.

The last sentence of the requested instruction complicates the question for this Court. This sentence, which tells jurors that character evidence alone may create reasonable doubt, is often referred to as a "standing alone" instruction. "The issue of whether, and under what circumstances, a defendant is entitled to a 'standing alone' character evidence instruction has long divided federal appellate courts." *United States v. Pujana-Mena*, 949 F.2d 24, 26 (2d Cir. 1991) (citing *Spangler v. United States*, 487 U.S. 1224 (1988) (White, J., dissenting from denial of certiorari)).

The division stems from differing interpretations of two U.S. Supreme Court decisions: *Edgington v. United States*, 164 U.S. 361 (1896) and *Michelson v.*

33

*United States*, 335 U.S. 469 (1948). In *Edgington*, evidence of good character was admitted at trial, and the district court instructed the jury that evidence of good character was only relevant if the rest of the evidence presented at trial established doubt regarding the defendant's guilt. *Edgington*, 164 U.S. at 365-66. The U.S. Supreme Court reversed. *Id.* In doing so, the Court stated:

> Whatever may have been said in some of the earlier cases, to the effect that evidence of the good character of the defendant is not to be considered unless the other evidence leaves the mind in doubt, the decided weight of the authority now is that good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. **The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt,** although without it the other evidence would be convincing.

*Id.* (emphasis added). Later, in *Michelson*, the U.S. Supreme Court discussed *Edgington*, and stated that the introduction of character evidence "is sometimes valuable to a defendant for this Court has held that such testimony alone, in some circumstances, may be enough to raise a reasonable doubt of guilt and that in the federal courts a jury in a proper case should be so instructed." *Michelson*, 335 U.S. at 476.

While the issue has arisen infrequently in this Circuit, the Court has generally been hostile to the "standing alone" character evidence instruction. *United States v. Krapp*, 815 F.2d 1183, 1187 (8th Cir.), *cert. denied*, 484 U.S. 860 (1987); *Black v. United States*, 309 F.2d 331, 343-44 (8th Cir. 1962), *cert. denied*,

34

372 U.S. 934 (1963). Other circuits also refuse to allow the "standing alone" character instruction. *See Pujana-Mena*, 949 F.2d at 28 n.2 (discussing circuit split and citing cases). These courts do so on the basis that they disagree with the U.S. Supreme Court's analysis of its own case: specifically *Michelson's* assessment of *Edgington. Id.* at 29.

On the other hand, the D.C. Circuit Court of Appeals always requires the "standing alone" instruction when character evidence is admitted. *United States v. Lewis*, 482 F.2d 632, 637 (D.C. Cir. 1973). Others circuits allow the "standing alone" instruction, at least under certain circumstances. *John*, 309 F.3d 298; *United States v. Burke*, 781 F.2d 1234, 1242 n.5 (7th Cir. 1985); *United States v. Foley*, 598 F.2d 1323, 1336-37 (4th Cir. 1979); *Oertle v. United States*, 370 F.2d 719, 726-27 (10th Cir. 1966). Metcalf asserts that the facts of his case required the instruction, as his case is similar to *John*, and that this Circuit should revisit its prior cases summarily rejecting the use of the instruction, no matter the circumstances.

Alternatively, even if the district court was correct to not include the "standing alone" portion of the instruction, the court still erred by failing to give the first portion, which provided the jury with guidance on how to consider the character evidence. The "standing alone" instruction is controversial; however, as was discussed above, the first two sentences of the proposed instruction are not.

35

Appellate Case: 16-4006    Page: 42    Date Filed: 12/21/2016  Entry ID: 4482350

*See* 1A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions: Criminal* § 15.15 (6th ed. 2015).

Metcalf's case is distinguishable from this Court's decision in *Krapp*. In *Krapp*, character evidence was properly admitted, but no character instruction was provided. *Krapp*, 815 F.2d at 1187. This Court found the district court did not err in failing to provide an instruction. *Id.* The Court determined that other instructions provided the jury guidance on how to consider the evidence, and that character evidence was not a main part of the defense. *Id.* at 1188.

That was not the case in Metcalf's trial. The other instructions did not provide any guidance on how to consider character evidence. The only other instruction that even mentioned character evidence was instruction nine. (DCD 99, p. 10). However, this instruction only told jurors how to consider evidence elicited during cross-examination of character witnesses. (DCD 99, p. 10). No other instruction even mentions character evidence. (DCD 99). Additionally, character evidence was a large part, if not the main part, of Metcalf's defense. In total, he called seven witnesses to testify as to his character. Therefore, the failure to provide a character instruction prejudiced Metcalf and is reversible error.

Appellate Case: 16-4006    Page: 43    Date Filed: 12/21/2016 Entry ID: 4482350

## CONCLUSION

For the reasons stated above, Metcalf respectfully asserts that this Court reverse his conviction.

Respectfully submitted,

*/s/ Heather Quick*
Heather Quick, Asst. Federal Defender
Federal Public Defender's Office
222 Third Avenue SE, Suite 290
Cedar Rapids, IA 52401
PHONE: (319) 363-9540
FAX: (319) 363-9542

37

Appellate Case: 16-4006    Page: 44    Date Filed: 12/21/2016 Entry ID: 4482350

## CERTIFICATE OF FILING AND SERVICE

I certify that on December 20, 2016, I electronically filed the foregoing brief and addendum with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users were served by the CM/ECF system. The brief and addendum were scanned for viruses using Symantec Endpoint Protection 12.1.4013.4013. I also certify that after receipt of notice that the brief and addendum are filed, I will serve a paper copy of this brief on defendant-appellant by mailing him a copy at Iowa County Jail, 960 Franklyn Ave., Marengo, IA 52301. I further certify that after receipt of notice that the brief and addendum are filed, I will transmit 10 paper copies of the brief and addendum to the Clerk of Court via Federal Express and 1 paper copy to the appellee via regular mail as noted below.

Respectfully submitted,

*/s/ Heather Quick*
Heather Quick, Asst. Federal Defender
Federal Public Defender's Office
222 Third Avenue SE, Suite 290
Cedar Rapids, IA 52401
PH: (319) 363-9540 FAX: (319) 363-9542

Copy to:
Anthony Morfitt, Asst. U.S. Attorney
U.S. Attorney's Office – N. District of Iowa
111 Seventh Avenue, SE
Cedar Rapids, IA 52401

38

Appellate Case: 16-4006   Page: 45   Date Filed: 12/21/2016 Entry ID: 4482350

**Fed. R. App. P. 32(a)(7) AND 8th CIR. RULE 28A(c) CERTIFICATION**

This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,948 words.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word version 14.0.7173.5000 in 14 font Times New Roman.

                                        Respectfully submitted,

Dated:  December 20, 2016          */s/ Heather Quick*
                                        Heather Quick, Asst. Federal Defender
                                        Federal Public Defender's Office
                                        222 Third Avenue SE, Suite 290
                                        Cedar Rapids, IA 52401
                                        PHONE: (319) 363-9540
                                        FAX: (319) 363-9542
                                        ATTORNEY FOR APPELLANT

Appellate Case: 16-4006   Page: 46   Date Filed: 12/21/2016 Entry ID: 4482350